Filed 6/14/23  P. v. Salcido CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FRANCISCO SALCIDO,<br><br>    Defendant and Appellant. | E079398<br><br>(Super.Ct.No. INF062246)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr., Judge.
Affirmed.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and
Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney
General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Lynne G.
McGinnis and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff
and Respondent.

Defendant and appellant Francisco Salcido appeals from the trial court's order denying his petition for resentencing under Penal Code[1] section 1170.95.[2] For the reasons set forth *post*, we affirm the court's order.

**FACTUAL AND PROCEDURAL HISTORY**[3]

A.     PROCEDURAL HISTORY

On April 19, 2011, a jury found defendant guilty of unlawfully carrying a loaded firearm while an active participant in a criminal street gang under section 12031, subdivision (a)(2)(c) (count 2), and unlawfully participating in a criminal street gang under section 186.22, subdivision (a) (count 3).  The jury hung on attempted murder on a peace officer (count 1), and assault with a deadly weapon on a peace officer (count 4).

After a second trial on the hung counts, on October 13, 2011, a jury convicted defendant of attempted premeditated and deliberate murder on a peace officer under sections 664 and 187, subdivision (a) (count 1), and assault with a deadly weapon on a peace officer under section 245, subdivision (d)(1) (count 4).  Moreover, the jury found true that in the commission of counts 1 and 4, defendant personally used a firearm under

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] While this appeal was pending, the Legislature amended and renumbered section 1170.95 as section 1172.6.  (Stats. 2022, ch. 58, § 10.)  We refer to section 1172.6 in this opinion, even though 1170.95 was the operative designation at the time of the underlying proceedings.

[3] On December 23, 2022, we granted the People's request for judicial notice filed on November 14, 2022.  The order states:  "[T]his court TAKES JUDICIAL NOTICE of the record of appellant's prior appeal in case No. E055709."

sections 12022.5, subdivision (a) and 1192.7, subdivision (c)(8); and that defendant personally discharged a firearm under sections 12022.53, subdivision (c) and 1192.7, subdivision (c)(8).)  The jury also found true that defendant committed count 1 for the benefit of, at the direction of, or in association with a criminal street gang under section 186.22, subdivision (b)(1)(c)).

In a bifurcated hearing on January 13, 2012, defendant admitted a strike allegation under sections 667, subdivisions (c) and (e)(1).  Thereafter, the trial court sentenced defendant to prison for a total term of 56 years to life.

After defendant appealed, this court reversed the gang participation conviction (count 3).  In all other respects, we affirmed the judgment.  (*People v. Salcido* (Jul 30, 2014, E055709) [nonpub. opn.] (*Salcido*).)

On March 21, 2022, defendant filed a petition for resentencing under section 1172.6.  On July 15, 2022, the trial court denied defendant's petition without issuing an order to show cause.

On July 18, 2022, defendant filed a timely notice of appeal.

B.     FACTUAL HISTORY[4]

"A.  *Prosecution*

"1.  *The shooting*

"On May 26, 2008, [Desert Hot Springs Police Sergeant Robert] Ritchie [(Ritchie)] attended a morning briefing at the police station.  He was informed at the

---

[4]  The facts are taken from the unpublished opinion in *Salcido*, case No. E055709.

3

briefing that an officer-involved shooting had occurred on Friday, May 23. The suspect in the shooting was a [West Side Locos (WDL)] gang member named Anthony Paez. Paez had shot at California Highway Patrol officers. Ritchie had been involved in two other incidents with Paez. During the first incident Paez ran from Ritchie, and in the second incident, Paez had been in possession of a shotgun.

"Around 3:00 p.m., Ritchie was on patrol in the area of Third Street in Desert Hot Springs. He was in full uniform and was driving a marked patrol car. His service weapon was a nine-millimeter firearm that he had loaded in the morning. As he was driving on Third Street, he observed a dark blue BMW. He recognized the car as one that he had seen Paez driving during a previous contact.

"Ritchie requested a records check of the car while he followed it. There was a female driver and [a] male passenger. The male passenger was moving around in his seat and then sat low in the seat. The passenger had a bald head which was consistent with Paez.

"Ritchie confirmed the BMW was the same one Paez had previously been seen driving. He followed the car and radioed for additional units because he believed that Paez was armed and dangerous. Ritchie did not immediately activate his lights and siren because he did not want to stop the car without assistance. He radioed to other units that they should come with lights and sirens activated.

"Suddenly, the car stopped near First and Cactus Streets. Ritchie stopped his car in the middle of the road and got out of his car. Ritchie stood behind the open driver's

4

side door of his car and pulled out his gun.  He pointed his weapon at the passenger's side door of the BMW but did not issue any commands.

"Defendant exited the passenger's side door.  Ritchie immediately recognized it was not Paez in the car.  He contacted police dispatch to advise the other responding officers that it was not Paez in the car.  Ritchie relaxed but continued to train his weapon at the BMW.  He dropped his gun two to three inches.  Ritchie gave no commands to defendant because he had nothing to say to him.  He also was talking to dispatch and did not have time to issue commands.

"Defendant faced away from Ritchie and his hands were not visible.  Initially, Ritchie did not see a gun.  Defendant closed the passenger's side door and the BMW drove away.  Ritchie was going to wait for other units to arrive and then detain defendant.

"Defendant walked three to four steps.  He suddenly turned to his left and fired first at Ritchie.  Defendant continued to shoot.  Ritchie shot back at defendant and emptied his entire magazine; his full magazine contained 17 bullets.  Ritchie described the incident as a 'full on gun battle.'  Ritchie crouched behind his car door.  Bullets hit the push bar in the front of the car and the bottom right corner of the driver's side door.  Defendant ran into a nearby empty field and could not be found.

"The recordings from Ritchie's calls to dispatch were played for the jury.  He relayed that he thought Paez was in the BMW.  He also stated that the BMW was pulling to the curb at Cactus and First Streets.  Ritchie stated that it was not Paez, and then the transcript immediately shows that Ritchie said, 'Shots fired!  Shots fired!'  Ritchie stated, 'There were shot[]s fired at me and I fired several shots south bound.'

5

"Two types of shell casings were found at the scene of the shooting: nine-millimeter and .45-caliber casings. A live round was also found. The casings were grouped together. An empty .45-caliber magazine was found in a dirt lot at the corner of Cactus and First Streets. A cellular telephone belonging to defendant was found just north of the area where the magazine was found.

"A text message dated May 26, 2008, and transmitted at 5:51 a.m. was found on defendant's cellular telephone. The text message stated, 'Without putting me on blast, I need to borrow the torch.' A 'torch' was gang language for needing to borrow a gun. There was another text message transmitted on May 26, 2008, at 10:25 a.m. that stated, 'Stranger, everything from that car is ready to go. Hit him up and get back to me. 500 the less, 600 is what we want. Gracias. PWDX3.' 'PWDX3' stood for either Pancho, which was defendant's gang moniker, or Puro, West Drive, and 13. There were also photographs of defendant with other WDL gang members on his telephone.

"Defendant was arrested at his cousin's house. Defendant tried to run but was apprehended. Near the apartment there was WDL graffiti stating 'WD,' 'Varrio WDL,' and 'West DR X3.' Near the scene of the shooting there was WDL gang graffiti on an abandoned structure. Grafitti stating 'Pancho' and 'West Drive X3' was on the structure.

"2. *Gang evidence*

"Investigator Ryan Monis testified as a gang expert. At the time of trial, he was employed as a Senior Investigator for the Riverside County District Attorney's Office. He was assigned to the Coachella Valley Violent Crime Task Force and had an extensive

background with both state and federal gang task forces.  He had testified as a WDL gang expert 15 to 20 times.

"WDL was a criminal street gang based in Desert Hot Springs.  The area of First and Cactus Streets was WDL gang territory.  The symbol for the gangs was WD or WDL.  The primary activities of WDL included homicide, attempted homicides, drug sales, possession of firearms, witness intimidation, robberies, and home invasion robberies.  The more violent the crime committed by the gang member, the more it instilled fear and intimidation in the community.

"There were several 'predicate' offenses that were presented.  These included two occasions—May 23 and May 30—during which Paez shot at officers.  Paez was convicted of several crimes including murder.  Another gang member was convicted of a home invasion robbery in 2005.

"Investigator Monis knew defendant.  Defendant had WDL tattoos.  Monis believed that in May 2008, defendant was an active WDL member.  Defendant had previously admitted to being a WDL member.  Defendant was an older and more active member and was considered a 'shot caller.'

"Monis interviewed Everett Gallegos in January 2011.  Gallegos was a former WDL member who had been imprisoned since 2001 for a gang-related murder which was committed in 1999.  Gallegos had previously testified against other WDL members.  Gallegos wanted help with being placed on his parole outside Desert Hot Springs because he feared retaliation.  Monis agreed to put in a good word for him.

"In 2011, Gallegos was not a WDL member and was not in good standing with the gang. Gallegos told Monis that the WDL members had a strong dislike for law enforcement, and especially the Desert Hot Springs Police Department. When Gallegos was a WDL member, sometime between 1997 and 2001, he was involved in discussions with other WDL members about harming or shooting police officers. These discussions included hiding behind the Desert Hot Springs Police Department and shooting at officers who exited the building. Defendant was not present during the discussions. Gallegos stated that if a WDL member had the opportunity to shoot at a police officer, the gang member would take a shot.

"In 2004, Monis spoke with another WDL gang member, Alejandro Escobar.4 Escobar also stated that if an opportunity arose for a WDL member to shoot at a Desert Hot Springs police officer, the gang member would take the opportunity.

"In 2004, Monis had observed graffiti in WDL territory that stated '187,' the Penal Code section for murder, and 'DHSPD,' which stood for Desert Hot Springs Police Department, underneath. It was his belief, based on his training and experience, that it was written by a WDL member and it was a threat to law enforcement.

"Monis listened to a jailhouse recording between defendant and Daniel Villa, another WDL gang member. They laughed about the exposure they were getting due to the shootings and the documentation in the newspaper. Villa said, 'We're getting worldwide exposure.'

"Monis, after being given a hypothetical that was the same as the facts in the instant case, proffered that the instant crime was committed for the benefit of and on

8

behalf of the WDL gang.  A big factor in deciding it was a gang crime was that there were three shootings involving WDL members against law enforcement during a seven-day period.  Monis indicated that to some extent all gangs have a dislike for law enforcement.

"B.  *Defense*

"Defendant testified on his own behalf.  He admitted becoming a WDL member in 1997 or 1998.  Paez was an acquaintance through the gang but defendant did not like the way he acted.  He had never heard WDL members, including Escobar, talk about killing or shooting Desert Hot Springs police officers.  Defendant's attitude toward law enforcement in 2008 was to avoid them at all costs so he was not harassed.

"Jessica Jimenez, defendant's girlfriend, picked him up in the BMW in the afternoon on May 26, 2008.  Defendant lowered the seat all the way down to the floorboard and could not see out the back window; he never saw a police car following them.

"Defendant told Jimenez to drop him off on First and Cactus Streets so he could visit his cousin who lived nearby.  Defendant exited the car and leaned back in to kiss Jimenez.  He started walking on Cactus; he never saw a car behind him.  In his waistband, defendant had a .45-caliber gun that he had bought two weeks prior for protection against rival gang members.

"As he was walking, he heard what sounded like someone racking a round into the chamber of a gun.  Defendant looked over his shoulder and saw a man in dark clothing

9

standing behind the door of a car, pointing a gun at him. Defendant was focused on the gun and could not tell it was a law enforcement officer.

"Within a few seconds, defendant heard a 'boom' and felt a bullet graze the top of his head. In defense, he started to shoot back. He fired eight or nine rounds. Defendant was only trying to stop the person from shooting at him; he did not intend to kill the person. As defendant ran from the scene, he realized that he had been shooting at a police officer.

"While defendant ran, the magazine accidentally fell out of his gun and his cellular telephone fell out of his pocket.

"Defendant presented his own gang expert, Enrique Tira. Tira was a private investigator who had been a police officer in Indio for 17 years. One month prior to trial, Tira spoke with Escobar. Escobar denied ever telling Monis that WDL gang members would kill Desert Hot Springs police officers if given the chance. Escobar admitted that WDL members did not like police officers but never said WDL hated law enforcement.

"Tira also interviewed Gallegos. Gallegos told Tira that gang members do not like police officers and police officers do not like gang members. He had never told Monis that he overheard WDL members talk about killing Desert Hot Springs police officers. Gallegos had no knowledge of any member of WDL being ordered to kill or shoot Desert Hot Springs police officers.

"Tira claimed that a gang would not want a member to shoot at a police officer because it would only cause more problems for the gang. Given hypotheticals similar to the facts of the instant case, Tira did not believe that shooting at a Desert Hot Springs

10

police officer was done for the benefit of the gang. Tira had never qualified as an expert on the WDL gang."

**DISCUSSION**

A. <u>THE TRIAL COURT PROPERLY FOUND DEFENDANT INELIGIBLE FOR RELIEF UNDER SECTION 1172.6</u>

On appeal, defendant contends that "the lower court erred in denying appellant's petition for resentencing pursuant to former section 1170.95 (now section 1172.6) without reviewing any briefing presented by either party or the record of conviction." For the reasons set forth *post*, we disagree with defendant and affirm the court's order.

1. *LEGAL BACKGROUND*

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) (SB 1437) became effective January 1, 2019. "[SB 1437] modified California's felony murder rule and natural and probable consequences doctrine to ensure murder liability is not imposed on someone unless they were the actual killer, acted with the intent to kill, or acted as a major participant in the underlying felony and with reckless indifference to human life." (*People v. Cervantes* (2020) 46 Cal.App.5th 213, 220.) As relevant here, SB 1437 added section 189, subdivision (e), which provides, "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in

11

the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).) Section 190.2, subdivision (d) provides, "Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

SB 1437 also created a process through which convicted persons can seek resentencing if they could no longer be convicted under the reformed homicide law. (§ 1172.6, subd. (a).) Section 1172.6, subdivision (a), provides in part, "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, *attempted murder under the natural and probable consequences doctrine*, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts." (Italics added.)

Section 1172.6, subdivision (c), provides, "Within 60 days after service of a petition . . . , the prosecutor shall file and serve a response. The petitioner may file and serve a reply within 30 days after the prosecutor's response is served. These deadlines

12

shall be extended for good cause. After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so." If the petitioner makes a prima facie showing he is eligible for relief under section 1172.6, the court shall hold an evidentiary hearing. (§ 1172.6, subds. (c) & (d)(1).) At this hearing, either party may present new evidence and the prosecution bears the burden of proving the petitioner could still be convicted beyond a reasonable doubt. (§ 1172.6, subd. (d)(3).)

In *People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*), the California Supreme Court found that former section 1170.95 entitled a defendant to have appointment of counsel after filing a proper petition and was entitled to have the opportunity for counsel to file briefing in response to any opposition filed by the People before the trial court makes its prima facie determination. (*Lewis*, at pp. 961-972.) As noted *ante*, this has been codified in section 1172.6, subdivision (c).

Thereafter, the California legislature passed Senate Bill No. 775, effective January 1, 2022. Senate Bill No. 775 amended former section 1170.95 to expand its scope to those convicted of "attempted murder under the natural and probable consequences doctrine." (§ 1172.6, subd. (a).) The bill also codified the holdings of *Lewis* regarding a petitioner's right to counsel and the standard for determining the existence of a prima facie case.

13

If a section 1172.6 petition contains all the required information, including "[a] declaration by the petitioner that the petitioner is eligible for relief," the trial court must appoint counsel if requested (§ 1172.6, subds. (b)(1)(A) & (b)(3)); the prosecutor must "file and serve a response" to the petition, to which the petitioner may reply (*id.*, subd. (c); and "[a]fter the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (*Ibid.*)

However, a trial court's failure to comply with these statutory requirements is harmless if the record of conviction establishes that a defendant is ineligible for section 1172.6 relief as a matter of law. (See *Lewis*, *supra*, 11 Cal.5th at p. 973 [trial court's statutory omissions at the first step process under section 1172.6 are not state or federal constitutional violations]; see also *People v. Hurtado* (2023) 89 Cal.App.5th 887, 893 (*Hurtado*).) " 'Typically, when an "error is purely one of state law, the *Watson* harmless error test applies." ' " (*Id.* at p. 892, quoting *Lewis*, at p. 973.)

## 2. *THE TRIAL COURT'S ERROR WAS HARMLESS*

Defendant contends that "the lower court erred in denying appellant's petition for resentencing pursuant to . . . (now section 1172.6) without reviewing any briefing presented by either party or the record of conviction."

We agree with defendant that the trial court failed to comply with the statutory requirements under section 1172.6. Notwithstanding the trial court's failure, we find the error harmless. Even if the court complied with the statutory requirements, there is no reasonable possibility that the court would have issued an order to show cause because

14

defendant was ineligible for relief as a matter of law. (*Lewis*, *supra*, 11 Cal.5th at p. 892; see also *Hurtado*, *supra*, 89 Cal.App.5th at p. 893.)

In this case, after defendant filed his pro. per. petition for resentencing, the trial court appointed counsel and scheduled a date for a status conference. The People did not file a response to the petition.

At the hearing on the petition on July 15, 2022, the prosecutor and defense counsel appeared. The prosecutor stated as follows:

"We've examined the opinion [from the underlying appeal, issued by this court] and the instructions that are both in imaging. It appears the defendant acted alone when firing a gun at a peace officer. He was found guilty by the jury of premeditated attempted murder on a peace officer. The charge in and of itself is not rendering the defendant ineligible because it was an attempt, not a completed murder on a police officer. Regardless, none of the jury instructions [that] would render [defendant] eligible were given. Nothing on aiding and abetting, natural and probable consequences, or felony murder." The prosecutor then asked the court to deny defendant's petition.

Defense counsel did not object. Instead, counsel stated: "I did review the record and jury instructions. I'm in agreement that [defendant] did not—they were not instructed on aiding and abetting, natural and probable consequences or felony murder."

The trial court summarily denied defendant's petition.

In addition to statements made by the prosecutor and defense counsel at the hearing on defendant's petition, the record shows that defendant alone attempted to murder the peace officer. Moreover, there is nothing in the record to indicate that the

15

jury was instructed with felony murder, aiding and abetting, or the natural and probable consequences instructions.

" ' "[I]f the record . . . 'contain[s] facts refuting the allegations made in the petition,' then 'the court is justified in making a credibility determination adverse to the petitioner.' " ' [Citation.] 'The record of conviction will necessarily inform the trial court's prima facie inquiry under section [1172.6], allowing the court to distinguish petitions with potential merit from those that are clearly meritless.' " (*Hurtado*, *supra*, 89 Cal.App.5th at p. 892, quoting *Lewis*, *supra*, 11 Cal.5th at p. 971.) Hence, "[a]s *the* attempted murderer, [defendant] is 'ineligible for relief' as 'a matter of law,' and 'there is no reasonable probability [defendant] would have obtained a more favorable result if' " the trial court had conducted an evidentiary hearing; "consequently, the trial court's errors were 'harmless.' " (*Hurtado*, *supra*, 89 Cal.App.5th at p. 893, quoting *People v. Mancilla* (2021) 67 Cal.App.5th 854, 864.).)

Here, because defendant acted alone and the jury was not given the pertinent jury instructions on felony murder, aiding and abetting, or under a natural and probable consequences theory, defendant is ineligible for relief under section 1172.6 as a matter of law. (*People v. Whitson* (2022) 79 Cal.App.5th 22, 34-36.) Therefore, even if the trial court had reviewed the briefing from the parties or the underlying record, there is no reasonable probability that an order to show cause would have been issued because the record of conviction conclusively demonstrates that defendant is ineligible for relief.

## DISPOSITION

The order denying defendant's petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

MENETREZ
J.